IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| CHARLIE STACY and CLIFFORD ALLEN, individually and on behalf of all others similarly situated, | Case No. 1:21-cv-00015-JPJ-PMS |
| Plaintiffs, | |
| v. | |
| JENNMAR CORPORATION OF VIRGINIA, INC., JENNMAR CORPORATION OF EAST VIRGINIA, INC., JENNMAR CONSTRUCTION TOOLS, LLC, and DOES 1 through 20, inclusive, | |
| Defendants. | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO NAMED PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION UNDER FED R. CIV. P. 23 AND FOR APPOINTMENT
OF CLASS COUNSEL UNDER FED. R .CIV. P. 23(G)**

Defendants Jennmar Corporation of Virginia, Inc. ("Jennmar Virginia"), Jennmar Corporation of East Virginia, Inc. ("Jennmar East Virginia"), Jennmar Construction Tools, LLC, ("Jennmar Construction Tools") and Does 1 through 20 (collectively, "Defendants"), by and through their undersigned counsel, file this Response in Opposition to Named Plaintiffs' Motion For Class Certification Under Federal Rule of Civil Procedure 23 and for Appointment of Class Counsel Under Federal Rule of Civil Procedure 23(G) ("Motion"). For the reasons stated below, Defendants respectfully submit that class certification be denied.

## I.    SUMMARY OF THE ARGUMENT IN OPPOSITION

Named Plaintiffs Charlie Stacy ("Stacy") and Clifford Allen ("Allen") (together, "Plaintiffs") are former employees of Defendant Jennmar Virginia who worked at its Cedar Bluff, Virginia facility ("Cedar Bluff Facility"). Plaintiffs have brought this action against all Defendants

alleging violations of the Federal Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq*. ("FLSA"), the Virginia Minimum Wage Act, Va. Code §§ 40.1-28, *et seq*. ("VMWA"), the Virginia Wage Payment Act, Va. Code § 40.1-29 *et seq.* ("VWPA"), and Virginia common law breach of contract and quantum meruit claims. Now, Plaintiffs ask this Court to certify a class of Defendants' current and former employees. However, even after extensive discovery, Plaintiffs cannot meet their burden to prove class certification is appropriate in this matter.

Plaintiffs' deposition testimony conclusively demonstrates that Plaintiffs cannot identify a common unlawful policy maintained by each Defendant. Moreover, Plaintiffs' deposition testimony directly contradicts their sworn affidavits that were attached to their Motion For Conditional Certification previously filed in this matter and that served as the basis for this Court's conditional certification of the FLSA collective action. The record is clear that Plaintiffs have no evidence to support their allegation that Defendants Jennmar Virginia, Jennmar East Virginia, and Jennmar Construction Tools each employed a common policy or practice that violates the VMWA, VWPA, or Virginia common law.

Instead, Plaintiffs can only point to 1) Jennmar Virginia's time rounding policy, which is lawful under the FLSA and Virginia law; and 2) Plaintiff's allegation that their second shift supervisor occasionally circulated paperwork to employees on that shift before those employees clocked-in, which even if true, is limited only to that shift at that facility. Thus, Plaintiffs offer on the one hand a lawful policy, therefore not appropriate for class certification, and on the other hand a potentially unlawful policy limited to a single supervisor on a single shift at a single facility, therefore not appropriate for class certification.

In the event this Court does grant class certification, such class should be limited to only those non-exempt second shift employees at Jennmar Virginia's Cedar Bluff, Virginia facility -

2

the only shift regarding which Plaintiffs can offer any evidence. Similarly, the appointment of named Plaintiffs as class representatives should be limited to only second shift employees at Jennmar Virginia's Cedar Bluff Facility. [1] For these reasons, and as set forth in greater detail below, this Court should deny Plaintiffs' Motion.

## II.    FACTUAL BACKGROUND

### A. Jennmar Virginia, Jennmar East Virginia, and Jennmar Construction Tools Manufacture Distinct Products at Separate Facilities.

Jennmar Virginia, Jennmar East Virginia, and Jennmar Construction Tools are product manufacturers specializing in the production of structural roof supports, bolts, beams, and rebar that is utilized in the agricultural, mining and tunneling industry. (Exhibit 1, October 21, 2021 Deposition of Nicole O'Leath at 27:16-28:22; 29:3-12). Frank Calandra, Inc. is the parent company of Jennmar Virginia, Jennmar East Virginia, and Jennmar Construction Tools, though each entity manufactures distinct products at separate facilities led by separate management. (*Id*. at 35:17-20).

Jennmar Virginia specializes in the production of bolts and does not manufacture any other product. (Ex. 1. at 67:3-18). Jennmar Virginia operates three separate facilities, including two facilities located in Cedar Bluff, Virginia and one facility located in Tazewell, Virginia. Jennmar East Virginia operates one facility located in Rich Creek, Virginia, and specializes in the production of roof bolts utilized in the mining industry. (*Id*. at 69:16-70:1; 76:14-19). Jennmar Construction Tools produces drill bits utilized in the agricultural industry at one facility in Bristol, Virginia. (*Id*. at 71:6-18; 80:22-5).

### B. Defendants' Timekeeping Policies Prohibit Off-The-Clock Work.

Defendants do not have a written timekeeping policy. (*Id*. at 205:9-16). Defendants prohibit

---

[1] Defendants do not oppose the appointment of Plaintiffs' counsel as class counsel under Rule 23(g).

any off-the-clock work by its hourly employees and hourly employees are never asked to work before or after punching off-the-clock. (Ex. 1 at 181:17-182:9; 245:12-246:1). Each onsite Human Resources Administrator for a particular facility revises and implements any timekeeping or personnel policies drafted by Frank Calandra, Inc. (*Id*. at 74:10-75:10). Additionally, each facility's plant manager screens applicants for potential employment. (*Id*. at 166:4-167:8). Each facility operated by Jennmar Virginia, Jennmar East Virginia, and Jennmar Construction Tools has two assigned shifts, although shifts vary based on the needs of a particular facility. (*Id*. at 142:9-15). Moreover, any personal protective equipment ("PPE") is issued individually at the plant level. (*Id*. at 51:14-13).

## C. Instructions Pertaining to Defendants' Lawful Rounding Policy Are Provided Individually by Each Facility's Human Resources Personnel.

Defendants' timekeeping systems round an hourly employee's time based on punch-in and punch-out time, calculating the amount of hours an employee worked each particular week. (*Id*. at 124:1-6). This timekeeping system rounds an employee's time to the nearest fifteen minute increment. (*Id*. at 124:10-125:7). Based on the rules built into Defendants' timekeeping system, an hourly employee's time is rounded up to 15 minutes when clocking-in eight minutes or more before a shift, and rounded down if clocking-in seven minutes or less before the shift. (Ex. 1 at 126:2-7; 175:5-176:8). Moreover, all hourly employees are instructed to clock-in when their shift starts. (*Id*. at 178:20-179:21). Hourly employees are never instructed to enter Defendants' facilities prior to the start of their shift and hourly employees are never instructed to complete work without clocking-in. (*Id*. at 180:15-181:20); (Exhibit 2, November 29, 2021, Deposition of Charlie Edward Stacy at 79:1:8 (Q: And it says that you were required to arrive prior to your shift. Who required you to arrive prior? A: Nobody specifically required me to be there…")); (Exhibit 3, December 1, 2021, Deposition of Clifford Allen at 24:11-22 (Q: Did anyone tell you that you

needed to arrive at 2:00 for a 2:30 shift? A: Not really, but I knew that if I got there, you know, I needed that time, because it was a hard job…")). Additionally, any instructions regarding time entry, such as memorandums on timekeeping are drafted individually by each facility's Human Resources Administrator, including notices posted in Jennmar Virginia's Cedar Bluff, Virginia and Tazewell, Virginia facilities, advising hourly employees to clock-in no earlier than seven minutes prior to the start of a shift and no later than seven minutes after the end of a shift. (Ex. 1 at 184:7-186:11- 190:15); (Exhibit 4, Jennmar Bates 053599, Cedar Bluff, Virginia Time Keeping Memorandum); (Exhibit 5, Jennmar Bates 053600, Tazewell, Virginia Time Keeping Memorandum). Onsite Human Resources personnel at each of Defendants' facilities also provide training to hourly employees on operating the time clock. (Ex. 1 at 174:13-22).

### D. Plaintiff Stacy's Knowledge is Limited to the Second Shift of Jennmar Virginia's Cedar Bluff Facility.

From October 2018 to March 29, 2021, Plaintiff Stacy worked as a crane operator and then as a production worker at Jennmar Virginia's Cedar Bluff Facility. (Ex. 2 at 63:2-10). Other than during the first week of his employment Plaintiff Stacy worked only the second shift. (Ex. 2 at 22:23-23:4; 99:1-14). Stacy testified that he feels "adequately compensated" for all time he worked with Jennmar Virginia, other than his pre-shift activities. (*Id*. at 78:3-11). Stacy also believes he was always paid on time by Jennmar Virginia. (*Id*. at 124:12-20). However, Stacy alleges that he was not paid for seven minutes of work incurred prior to each shift. (*Id*. at 39:23-4-:15).

Stacy has never worked at any Defendant facility other than Jennmar Virginia's Cedar Bluff Facility, where his immediate supervisor was Tim Stiltner. (*Id*. at 23:5-12). Stacy admits he was never instructed by anyone to arrive at Jennmar Virginia's worksite at any particular time prior to the start of a shift, although he testified that he would arrive at Jennmar Virginia's facility thirty-minutes before the start of a shift. (*Id*. at 30:8-19; 78:20-79:20; 99:1-7). Stacy was never

asked to work overtime at the end of a scheduled shift or to work off-the-clock. (Ex. 2. at 38:23-39:8).

Stacy testified he would arrive to Jennmar Virginia's facility in uniform, which consisted of a colored shirt and pants. (*Id*. at 146:24-147:46). Prior to the start of his scheduled shift, Stacy's second shift supervisor would distribute safety sheets to employees, although this would "[occur] not real often. It was just every now and again we'd get some safety sheets to look at it." (*Id*. at 100:25-19). Stacy also testified that he was able to review these safety sheets in five minutes. (*Id*. at 100:25-104:10). Stacy does not know why these safety sheets were only distributed sporadically and does not know if they related to his duties as a production worker. (*Id*. at 83:3-18; 143:5-144:3). The topics of those safety sheets included "tornadoes, ice, slipping and falling [and] bomb threats." (*Id*. at 143:5-15).

Prior to entering the production floor, Stacy would put on safety glasses and a hard hat from his personal locker that was beside the facility's break room. (*Id*. at 90:1-18). It would take him "a couple seconds" to put on his safety glasses.  He does not know how long it would take him to put on his hard hat, but he "just bend[s] his arm and put[s] it up there." (*Id*. at 91:25-92:3; 146:7-13).

Stacy further testified that he would clock-in after leaving the breakroom but *before* he would enter the facility's test lab for instructions and then proceed to the facility's production floor. (*Id*. at 84:17-20). Once clocked-in, he would check off safety sheets before accessing PPE stored in a cabinet beside his assigned machine. (*Id*. at 84:6-85:16; 90:1-12). While clocked-in and on the production floor, Stacy would inspect his work area from the previous shift, perform a safety check and prepare the settings of the machine he was assigned to, and "band" tools he intended to utilize during his shift. (*Id*. at 93:96:7; 98:16-25).

Stacy never received a written warning for clocking-in prior to the start of a shift, and he never complained to Jennmar Virginia's management or human resources regarding timekeeping practices. (Ex. 2 at 41:11-13; 111:17-23). Stacy never received instructions from Jennmar East Virginia or Jennmar Construction Tools and has never spoken with, observed, or worked with employees working in facilities other than of Jennmar Virginia's Cedar Bluff Facility. (*Id*. at 68:5-69:19; 122:6-12). Stacy admits he does not know what timekeeping policies or pre-shift instructions are provided to employees working in facilities other than Jennmar Virginia's Cedar Bluff Facility. (*Id.* at 69:20-70:7; 123:15-124:3).

## E.  Plaintiff Allen's Knowledge is Limited to Jennmar Virginia's Cedar Bluff, Virginia Facility.

From October 2018 to November 2020, Plaintiff Allen worked as a production worker at Jennmar Virginia's Cedar Bluff Facility. (Ex. 3 at 16:23-17:4). Other than during the first week of his employment, Allen worked only the second shift. (*Id*.) Allen testified that he was not paid for up to seven minutes of time worked prior to the start of his shifts, but that all payment for other time worked was "absolutely" correct. (*Id*. at 60:10-17). Allen believes that his paystubs accurately captured all time that he worked, and that he was properly paid for all overtime worked. (*Id*. at 35:5-8; 37:21-24).

Allen's immediate supervisor at Jennmar Virginia's Cedar Bluff Facility was Stiltner, whom he described as "a real good guy." (*Id*. at 18:11-16). Allen admits he was never instructed to arrive at any particular time prior to the start of his shift, and Stiltner never told Allen that he was prohibited from clocking-in prior to the start of his shift. (*Id*. at 24:11-22; 33:8-10). Allen would put on his boots and safety glasses while at his home. (*Id*. at 23:6-8). He would arrive at work approximately 30 minutes prior to the start of his shift to get himself "mentally prepared," which for him meant praying. (*Id*. at 23:6-24:6; 30:18-31:3).

Allen did not have a locker at the Cedar Bluff Facility and he kept his PPE in his vehicle "because I just was afraid I would forget something." (Ex. 3 at 29:11-14). Allen alleges that Stiltner distributed paperwork in the breakroom to second shift employees before they clocked-in, "or if he had a little bit more to do, it would be at the cabinet that we got our PPE at." (*Id*. at 22:15-20). This paperwork assigned employees to a specific machine and contained "safety check lists" at the bottom. (*Id*. at 25:16-23). Allen testified this paperwork would take him "five or ten minutes" to review. (*Id*. at 28:23-29:5). Allen would then leave the break room, clock-in, and enter the production floor. (*Id*. at 28:19-29:5).

Once clocked-in and on the production floor, Allen would complete a production sheet at his assigned machine. (*Id*. at 26:7-29:9). Additionally, once clocked-in, Allen would obtain PPE from a cabinet on the production floor. (*Id*. at 29:22-30:14). He would then check his machine for any leaks and ensure that all guards were in place. (*Id*. at 31:14-22). Allen would also complete a safety sheet which was attached to his machine by a clipboard. (*Id*. at 32:4-7). This safety sheet, along with the production sheet, would be turned in at the end of Allen's shift while he was clocked-in. (*Id*. 32:4-14). Allen was never required to perform any post-shift activities for which he was not compensated. (*Id*. at 78:9-16). Allen never received a verbal or written warning for clocking-in early and he does not know if anyone has ever been disciplined for clocking-in early. (*Id*. at 69:8-20). Stiltner never told Allen that anything negative would happen if he complained about Jennmar Virginia's policies. (*Id*. at 73:19-22).

Allen's knowledge and experience is limited to his shift at his facility. Allen has never spoken with employees at any facility other than Jennmar Virginia's Cedar Bluff Facility at which he worked. (*Id*. at 73:24-75:7). Allen does not know if Jennmar Virginia's rounding rule is in effect at any other facility or for any other Defendant. (*Id*. at 77:11-15). Allen has never worked for any

8

other Defendant and he has never been supervised or managed by an employee of any other Defendant. (*Id*. at 56:18-24; 57:2-19).

## III.   ARGUMENT

"The party seeking class certification bears the burden of proof" to establish the four threshold requirements of Rule 23(a). *Leinhart v. Dryvit Systems, Inc.*, 255 F.3d 138, 146 (4th Cir. 2001). The moving party must affirmatively demonstrate that (1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a); *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 337 (4th Cir. 1998.). "These basic prerequisites are commonly referred to "as numerosity, commonality, typicality, and adequacy." *Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*, 254 F.R.D. 68, 71 (E.D.N.C. 2008).

Courts may not presume a moving party has conformed to the requirements of Rule 23. *See Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160 (1982). Rather, a "party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis original).

If, and only if, the party seeking class certification successfully establishes the requirements of Rule 23(a), it must then show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also Broussard*, 155 F.3d at 337 n.3 (analysis under

9

Rule 23(b) only necessary if plaintiff first meets requirements of Rule 23(a)); *Messer v. Bristol Compressors Int'l, LLC*, No. 1:18CV00040, 2019 WL 2550328, at \*2 (W.D. Va. June 20, 2019).

"Rule 23 does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350). Therefore, at the class certification phase, a court need not accept as true the allegations in a complaint. *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004). Instead, the party seeking certification "must present evidence that the putative class complies with Rule 23." *EQT Production Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014) (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). The court must then "take a 'close look'" at the "facts relevant to the certification question, and, if necessary, make specific findings" relevant to certification. *Thorn v. Jefferson-Pilot Life Insurance Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (citing *Gariety*, 368 F.3d at 365). "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Dukes*, 131 S.Ct. at 2551 (quoting *Falcon*, 457 U.S. at 160–61.

As set forth below, Plaintiffs cannot meet Rule 23's rigorous analysis required for class certification of their Virginia state statutory or common law claims.

**A. Plaintiffs Cannot Satisfy Rule 23(a)'s Commonality Requirements.**

The overlapping commonality and typicality requirements are subject to a collective analysis. These requirements "ensure that only those plaintiffs and defendants who can advance the same factual and legal arguments may be grouped together in a class." *Broussard*, 155 F.3d 331 at 340 (*quoting Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 341 (7th Cir. 1997)). Commonality requires a party seeking class certification to show that the alleged "common contention . . . must be of such a nature that . . . its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Ealy v. Pinkerton Gov't Servs*.,

*Inc*., 514 F. App'x 299, 304 (4th Cir. 2013). "A question is not common . . . if its resolution turns on a consideration of the individual circumstances of each class member." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006). Moreover, courts are permitted to examine the merits of the putative class members' claims to the extent necessary to "make specific findings establishing that the case satisfies the several requirements for certification." *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1312-13 (4th Cir. 1987).

    i.    <u>Plaintiffs can offer no evidence of a uniform and unlawful policy employed by multiple supervisors of three separate companies across five separate facilities.</u>

Here, Plaintiffs cannot identify any evidence, yet alone a representative sampling of employees working for three separate companies in five different facilities, demonstrating a common policy applicable to the class. *See Basco v. Wal–Mart Stores, Inc.,* NO. 00–3184 SECTION "K" (4), 2004 WL 1497709, at *7, 2004 U.S. Dist. LEXIS 12441, at *22 (E.D. La. 2004) (finding alleged corporate policy of keeping wage low insufficient to justify conditional certification when "the 'policy' was not even uniformly or systematically implemented at any given store"); *Bayles v. Am. Med. Response,* 950 F.Supp. 1053, 1061–63 (D. Colo. 1996) (denying conditional certification when "each plaintiff's proof of violation will be individualized because it depends upon how or whether defendant's policy was implemented by individual managers with regard to individual plaintiffs, not what the policy was"). Moreover, "the adequacy of the representative testimony necessarily will be determined in light of the nature of the work involved, the working conditions and relationships, and the detail and credibility of the testimony." *LaFleur,* 30 F. Supp. 3d at 473 *citing Sec'y of Labor v. DeSisto,* 929 F.2d 789, 793 (1st Cir. 1991).

As discussed above, Jennmar Virginia operates three separate facilities, including two facilities in Cedar Bluff, Virginia, and one facility in Tazewell, Virginia. Jennmar East Virginia operates one facility located in Rich Creek, Virginia, and Jennmar Construction Tools operates

one facility in Bristol, Virginia. (Ex. 1 at 71:6-18; 80:22-5). Plaintiffs Stacy and Allen have never

worked at any facility other than Jennmar Virginia's Cedar Bluff Facility and their knowledge is

admittedly limited to the practices implemented on that facility's second shift. Plaintiff Stacy

testified that has never received instructions from an employee of Jennmar East Virginia or

Jennmar Construction Tools, and has never spoken with, observed, or worked with employees

working in facilities outside of Jennmar Virginia's Cedar Bluff Facility. (Ex. 2 at 69:5-70:7).

Plaintiff Allen also testified that he has never worked at a facility operated by Defendants Jennmar

East Virginia and Jennmar Construction Tools, and he has never been supervised or managed by

an employee of Defendants Jennmar East Virginia and Jennmar Construction Tools. (Ex. 3 at

56:18-24; 57:2-8; 57:10-19). Thus, Plaintiffs admit to having no knowledge – even second-hand

or hearsay knowledge – regarding what, if any, pre-shift checklists were distributed in the

breakroom of any other Defendant, any other facility, or any other shift. Accordingly, Plaintiffs

offer nothing more than speculation to allege that Jennmar East Virginia and Jennmar Construction

Tools employed the same practices as Defendant Jennmar Virginia with respect to their pre-shift

work.

      ii.      <u>Plaintiffs can only offer testimony of lawful experiences unique to their individual employment with Jennmar Virginia.</u>

The crux of Plaintiffs' allegation – that Defendants failed to pay them for seven minutes of

work – is predicated entirely on the alleged pre-shift instructions and paperwork distributed in the

breakroom by their second shift supervisor, Mr. Stiltner, prior to Plaintiffs clocking-in. Plaintiffs

Stacy and Allen each testified that they were never instructed to arrive the Jennmar Virginia's

Cedar Bluff Facility at a specific time before the start of their shift. (Ex. 2 at 30:8-19; 78:20-79:20;

99:1-7; Ex. 3 at 24:11-22; 33:8-10). Plaintiff Stacy testified that prior to the start of his scheduled

shift, Mr. Stiltner would distribute safety sheets, although this would "[occur] not real often. It was

just every now and again we'd get some safety sheets to look at it," and he was typically able to review these sheets in five minutes. (Ex. 2 at 100:25-104:10). Plaintiff Stacy further testified that he would clock-in after leaving the breakroom, prior to entering the facility's test lab, at which time all other work was performed while on the clock and with compensation. (*Id*. at 84:17-20).

Similarly, Plaintiff Allen alleges that Mr. Stiltner distributed paperwork in the breakroom to Plaintiff Allen and other second shift employees before they clocked-in, "or if he had a little bit more to do, it would be at the cabinet that we [Plaintiff Allen and shift second workers] got our PPE at." (Ex. 3 at 22:15-20). 29:5). This paperwork would list which machine Plaintiff Allen and other employees were assigned to, and included "safety check lists" at the bottom. (*Id*. at 25:16-23). Plaintiff Allen testified this paperwork would take him "five or ten minutes" to review and that he would then leave the break room, clock-in, and enter the production floor of the Cedar Bluff Facility. (*Id*. at 28:19-29:5). Plaintiff Allen would then leave the break room and clock-in at which time all other work was performed on the clock with compensation, including completing a production sheet at his assigned machine and removing PPE from a cabinet on the production floor, consisting of no cut gloves, rubber gloves, white cotton gloves, Kevlar protective arm sleeves, and ear plugs. (*Id*.)

Consequentially, Plaintiffs Stacy and Allen's deposition testimony directly contradicts the allegations set forth in the Complaint, Plaintiffs' sworn affidavits that were attached their Motion For Conditional Certification, and the Factual Background section of Plaintiffs' Motion. Plaintiffs Stacy and Allen each testified that they clocked-in prior to entering the production floor of the Cedar Bluff Facility. (Ex. 2 at 32:8-12; Ex. 3 at 29:7-21). Once Plaintiffs were clocked-in, Plaintiffs had access to a locker containing PPE and to the machines on the production floor that they operated. (Ex. 2 at 32:8-12 "we'd clock-in, we'd walk onto the floor, and there would be a

13

cabinet there that has the PPE"); (Ex. 3 at 29:7-21) (Q: Would you typically leave the break room, clock-in, and then go out on the production floor? A: Yeah." "Q: When you went out on the production floor, was the first thing to do to go to the cabinet for PPE? A: You've got to have PPE there. You'd get your hand cut off…").

In support of this Motion, Plaintiff's Motion alleges that "[h]ourly employees arrived prior to the start of their scheduled shift to perform essential job duties including, not limited to getting and completing paperwork, including  "safety sheets" and checklists; putting on personal protective equipment ("PPE"), including safety glasses, gloves, and cut-resistant Kevlar sleeves; performing safety checks on the machines, preparing tools, setting up the machines, and ensuring their work area as clean." (ECF 36 at pp. 4-5). Yet, each Plaintiff testified that donning PPE and preparation and cleaning of machines, tools, and the work area was done after clocking-in and all such time was paid.

Plaintiffs' reference in their Motion to Defendants' Hourly Employee Safety Orientation slides is directly contradicted by the sworn testimony. (*Id*. at p. 5, n. 7). While it is true those Orientation Slides state that "[a]ll employees are required to maintain their work areas before, during and at the end of each work shift"), Plaintiffs specifically testified they did not access the production floor or their work stations until *after* they clocked-in. (Ex. 2 at 98:16-25) (Q: "Would you be clocked-in for this work [checking behind the previous shift to make sure everything was clean and correct " A: "Yes"); (Ex. 3 at 65:13-15) (Q: "Would you be clocked-in when you were getting the tools and preparing tools?" A: "Yes").

Thus, Plaintiffs' suggestion that the tasks set forth in Defendants' Hourly Employee Safety Orientation Slides occurred prior to Plaintiff's clocking-in, and was therefore unpaid, is directly contradicted by Plaintiffs' deposition testimony. Moreover, the only experience or even awareness

14

to which Plaintiffs can testify is their allegation that Mr. Stiltner would at times distribute paperwork in the breakroom to second shift employees before they clocked-in. (Ex. 2 at 100:25-104:10; Ex. 3 at 22:15-20).

Although this Court need not accept Plaintiffs' allegations as true when considering class certification, even if true these allegations demonstrate only that a highly individualized factual analysis is required, even as to the paperwork distribution practices of one supervisor on one shift. Because Plaintiffs allegations are limited exclusively to their own unique pre-shift experiences, Plaintiffs cannot meet their burden to prove commonality. *Thorn*, 445 F.3d at 319 ("A question is not common . . . if its resolution turns on a consideration of the individual circumstances of each class member.").

### iii.       Plaintiffs Have Failed to Present Any Evidence Suggesting That Defendants' Time Rounding Policy Is Unlawful.

Plaintiffs' Motion should be denied because they cannot establish that they and employees of Jennmar Virginia, Jennmar East Virginia, Jennmar Construction Tools were victims of a common *unlawful* policy or plan with respect to Defendants' time rounding practice. "29 C.F.R. § 785.48(b) permits employers to round time to the nearest quarter of an hour, provided that the arrangement averages out so that the employees are fully compensated for the time they actually work." *Hardy v. Lewis Gale Med. Ctr.*, LLC, 377 F. Supp. 3d 596, 614 (W.D. Va. 2019). Moreover, 29 C.F.R. § 785.48(b) provides that such a rounding practice will be accepted, "provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked." *Id*; *Adair v. Wis. Bell, Inc.,* No. 08–C–280, 2008 WL 4224360, at *11 (E.D. Wis. Sept. 11, 2008) (approving policy where there was no evidence to suggest it systematically favored employer); *McElmurry v. US Bank Nat'l Assoc.*, No.CV-04-642, 2004 WL 1675925, at *11-15 (D. Or. July

27, 2004) (declining to conditionally certify a collective action where "the similarly situated determination in terms of actual wage loss requires individual employee-by-employee, timesheet-by-timesheet inquiries which are inconsistent with a collective action's goal of promoting judicial efficiency.") Here, Plaintiffs' own allegations establish that the rounding practice is lawful in that Plaintiffs state that their time was rounded up to 15 minutes when clocking-in eight minutes or more before a shift, and rounded down if clocking-in seven minutes or less before the shift. (ECF 36 at p. 12).

Moreover, applicable regulations provide that, "[i]n those cases where time clocks are used, employees who voluntarily come in before the regular starting time or remain after their closing time, do not have to be paid for such periods provided, of course, that they do not engage in any work." 29 C.F.R. § 785.48. Similarly, an employer's rounding policy complies with the FLSA if it "applies a consistent rounding policy that, on average, favors neither overpayment nor underpayment." *Corbin v. Time Warner Ent.-Advance/Newhouse P'ship*, 821 F.3d 1069, 1076 (9th Cir. 2016). Explaining this principle, the Ninth Circuit Court of Appeals in *Corbin* held that an employer's rounding policy is lawful so long as it is neutral:

> Employers use rounding policies to calculate wages efficiently; sometimes, in any given pay period, employees come out ahead and sometimes they come out behind, but the policy is meant to average out *in the long-term.* If an employer's rounding practice does not permit both upward and downward rounding, then the system is not neutral and "will . . . result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked."

*Id*. at 1077 (emphasis in original).

Plaintiffs do not allege the existence of an illegal rounding policy. Instead, Plaintiffs' Motion describes a neutral rounding policy that permits both upward and downward rounding on

a consistent basis. Specifically, Plaintiffs' Motion alleges Defendants' rounding policy rounded upward and downward, depending on the time the employee clocked-in:

> For example if an employee had a scheduled start time of 2:00 P.M. for his shift, yet clocked in eight (8) minutes early, Defendants' timekeeping system would round this employee's start time down to 1:45 P.M. Conversely, if this same employee clocked in seven (7) minutes early, Defendants' timekeeping system would round this employee's start time up to 2:00 P.M.

(ECF 36 at p. 12).

Moreover, Plaintiffs testified that they were never instructed to arrive at the Jennmar Virginia's Cedar Bluff Facility at any specific time before the start of their shift. (Ex. 2 at 30:8-19; 78:20-79:20; 99:1-7; Ex. 3 at 24:11-22; 33:8-10). Thus, while Plaintiffs may think Defendants rounding policy is unfair, it is not unlawful. The rounding policy as alleged by Plaintiffs is neutral and lawful, since "in any given pay period, employees come out ahead and sometimes they come out behind, but the policy is meant to average out *in the long-term.*" *Corbin*, 821 F.3d 1069 at 1077 (emphasis in the original). While this is the only policy for which the Plaintiffs can even credibly suggest extends beyond the second shift at Jennmar Virginia's Cedar Bluff Facility, this allegation fails to serve as a common policy sufficient to bind together a class since it is not unlawful.

In sum, Plaintiffs' claims under the VMWA, VWPA, and Virginia common law lack commonality because the issue regarding whether Plaintiffs' supervisor distributing pre-shift instructions to the second shift at Jennmar Virginia's Cedar Bluff Facility, including how frequently these instructions were distributed, and the amount of time required to review these instructions, requires the Court to conduct an individual assessment of each employee's alleged daily activities that might have occurred off-the-clock. Moreover, Defendants time rounding

policy, the only policy which Plaintiffs can suggest extends beyond Jennmar Virginia's second shift, even as alleged, is lawful. Therefore, class certification should be denied.

### B. The Proposed Class Is Not Sufficiently Cohesive To Warrant Class Representation.

In a class action brought pursuant to Rule 23(b)(3), "the commonality requirement of Rule 23(a)(2) is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over the other questions." *EQT Prod. Co.*, 764 F.3d at 365. "Nonetheless, the Rule 23(a) commonality requirement, and the Rule 23(b)(2) predominance requirement remain separate inquiries and the inquiries should not be blended." *Ealy*, 514 Fed. Appx. at 305. "The predominance inquiry focuses not only on the existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation." *EQT Prod. Co.*, 764 F.3d at 366. This inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Anchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997). It applies the same analytical principles as Rule 23(a) but is "more demanding." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2012).

Even if Plaintiffs could meet the commonality and typicality requirements of Rule 23(a), which they cannot do, their claims do not withstand the "more demanding" predominance inquiry required for class certification. Plaintiffs aver that Rule 23(b)(3)'s predominance requirements have been met because "the same basis factual circumstances apply to reach putative class member—each employee worked similar hours, performed similar duties, and were subject to the same common practices of Defendants." (ECF 36 at p. 20). As an initial matter, this argument is unavailing since Defendants' time rounding policy, the only policy which Plaintiffs can suggest extends beyond Jennmar Virginia's second shift, is lawful. Moreover, this argument directly contradicts Plaintiffs Stacy and Allen's deposition testimony that they never worked at any facility

other than Jennmar Virginia's Cedar Bluff Facility and that their knowledge is limited exclusively to the practices utilized on this facility's' second shift. (Ex. 2 at 69:5-70:7; Ex. 3 at 56:18-24; 57:2-8; 57:10-19).

Thus the only way to establish compensability of this alleged pre-shift activity is by conducting individualized assessments of, at a minimum, the frequency of the alleged distribution of pre-shift checklists, the substance and requirements of the checklist, whether the checklists differed for different employees performing different tasks, and the amount of time required by an individual employee to review the checklist. *See Lienhart*, 255 F.3d at 149 ("If such an individualized inquiry is needed to determine the membership of a workable class, it is clear that common issues do not predominate over individual issues as required by Rule 23(b)(3)").

Accordingly, the issues Plaintiffs seek to resolve through proposed class action does not meet Rule 23(b)(3)'s requirement that it "predominate over any questions affecting only individual members," necessitating that this Court deny Rule 23.

## IV. CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion For Class Certification Under Federal Rule of Civil Procedure 23 and for Appointment of Class Counsel Under Federal Rule of Civil Procedure 23(G). In the alternative, in the event this Court does grant class certification, the class should be limited to those non-exempt second shift employees at Jennmar Virginia's Cedar Bluff Facility, the only shift which can offer any evidence. Additionally, the appointment of named Plaintiffs as class representatives should be limited to those same employees.

Respectfully submitted this 7th day of January, 2022.

/s/ *K. Maxwell Bernas*

K. Maxwell Bernas
VA Bar No. 90553
Kmbernas@fordharrison.com
FordHarrison LLP
1300 19th Street, NW, Suite 420
Washington, DC 20036
Telephone: 202-719-2047
Facsimile: 202-719-2077

Benjamin P. Fryer (*pro hac vice*)
NC Bar No. 39254
bfryer@fordharrison.com
FordHarrison LLP
6000 Fairview Road, Suite 1415
Charlotte, NC 28210
Telephone: 980-282-1900
Facsimile: 980-556-7183

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 7th day of January, 2022, I caused a true and accurate copy of

the foregoing Defendants' Response in Opposition to Named Plaintiffs' Motion For Class

Certification Under Fed. R. Civ. P. 23 and For Appointment of Class Counsel Under Fed. R. Civ.

P. 23(G) to be served via electronic mail to the following counsel:

Gregg Greenberg
Zipin, Amster & Greenberg, LLC
8757 Georgia Ave, Suite 400
Silver Spring, MD 20910
ggreenberg@zagfirm.com

Robert Tucci
Francisco Mundaca
The Spiggle Law Firm, PLLC
430A 31st Street, S., Suite A
Arlington, VA 22206
rtucci@spigglelaw.com
fmundaca@spigglelaw.com

*Attorneys for Plaintiffs*

/s/ *K. Maxwell Bernas*
K Maxwell Bernas
VA Bar No. 90553
kmbernas@fordharrison.com
FORDHARRISON LLP
1300 19th Street, NW, Suite 420
Washington, DC 20036
Telephone: 202-719-2047
Facsimile: 202-719-2077

*Attorney for Defendants*